368

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF CINCINNATI ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* WALTER ET AL., APPELLANTS AND CROSS-APPELLEES.

(No. 78-1284—Decided June 13, 1979.)

*Mr. John A. Lloyd, Jr.,* and *Ms. Nancy A. Lawson,* for appellees and cross-appellants.

*Mr. William J. Brown,* attorney general, *Mr. David H. Beaver* and *Mr. Henry A. Arnett,* for appellants and cross-appellees.

WILLIAM B. BROWN, J.

I.

The various provisions of Ohio law which are challenged in this litigation revolve around the allocation formula contained in R. C. 3317.022. That section provides the principal rule for state basic aid allocation, while the other challenged provisions adjust for the cost differences among districts and facilitate the transition from the former formula to the guaranteed yield formula.

R. C. 3317.022 contains a two-part formula under which each school district participating in the state basic aid program is guaranteed:

"[T]he same number of dollars per pupil, *in state and local funds combined,* for each mill of local property tax effort as in any other district, up to a maximum millage rate set by the state [30 mills]." (Education Review Committee Report, December 15, 1974, at page 3; see fn. 1, *infra.*)

This "equal yield for equal effort" formula is calculated for each district by a formula which pegs the level of each district's state funding to a mathematically "equalized" level of property wealth and a mathematically "equalized" tax rate. The law requires that each school district levy at least 20 mills in order to participate, and it rewards districts which levy more than 20 school operating mills commensurately with their millage up to 30 mills. This last element is called "reward for effort." The entire basic support formula is referred to as "guaranteed

yield" and "equal yield" and is a variation of a type of school financing called "district power equalizing," "power equalizing," "DPE," and "percentage equalizing." Its objective is to equalize the property wealth base upon which the school districts raise operating revenue through the levy of voter-approved taxes so that school districts receive the same number of dollars per pupil in basic state aid plus local revenue for each mill up to 30 mills.

The first step in the State Basic Aid Formula provides for a total yield of $48 per pupil per mill from both local revenue and state support for the first 20 mills, assuming the system is fully funded. This means that, if all the districts received all the local tax revenues which they were presumed under the formula to receive, each district in the state which levies 20 mills would be eligible to receive from local and state funds 20 mills x $48 or $960 per pupil. The state in that manner provides the basic support to each school district for the first 20 mills by making up the difference between the district local yield per pupil per mill and $48.

The second calculation for state basic aid is the element of the state finance system called "reward for effort" wherein the state pays a bonus to and rewards school districts for their school operating millage above 20 mills up to 30 mills. For that quantum of funding, the guaranteed level is pegged at $42 per pupil per mill. Since the purpose of the act is to pay extra monies to districts based upon the number of mills they levy beyond 20 mills, the procedure is to deduct the district's local yield per pupil per mill from $42 and multiply that difference by the number of students (Average Daily Membership [ADM]) and finally by the "equalized" millage in excess of 20 up to 30.

The enactment by the General Assembly of a guaranteed yield formula inherently involves a policy decision as to the funding level or the amount to be guaranteed through the formula. The General Assembly's decision was to establish a funding level of $960 per pupil at 20 mills up to $1,380 per pupil at 30 mills.

That policy decision was based upon the recommenda-

tion of the Education Review Committee.[1] The committee in the "Goettle Report" found that the 1973-1974 cost for a school district to operate at the state minimum standards which define a general education of high quality was $715 per pupil. The committee, therefore, reasoned that the $960 guarantee at 20 mills was sufficient to provide an adequate program in each district. The committee also recognized that the funding level would necessarily have to be increased as inflation continued to increase the cost of education.

In addition to state basic aid, certain school districts also receive additional state aid under the "save harmless" guarantee. This provision guarantees that a school district will not receive less under the new "Equal Yield Formula" than it did under the former funding system. The state also provides direct grants to school districts which offer specialized programs. Finally, the system rewards or penalizes school districts depending upon their compliance or non-compliance with certain mandated requirements.

II.

The first issue presented to this court for decision is whether Ohio's statutory system for financing elementary and secondary education violates the Equal Protection and Benefit Clause, Section 2, Article I of the Ohio Constitution.

The trial court's declaratory judgment order stated that the system establishes invidious classifications among Ohio's school children which are neither supported by any compelling state interest nor predicated upon any rational basis, resulting in a violation of the Equal Protection Clause. The Court of Appeals affirmed the trial court's

---

[1] The Education Review Committee was established in 1973 and continues to function. It is a joint, nonpartisan legislative committee created by the General Assembly to analyze Ohio's school finance system and to consider alternative distribution methods for allocating state basic aid. It has been funded so as to have carried out those legislative directions and so as to have developed independent research capabilities to enable ongoing study and monitoring of the new formula.

findings and agreed that Section 2 of Article I of the Ohio Constitution provides Ohio's school-age children with a "fundamental right" to equal educational opportunity.

Defendants argue that the lower courts should be reversed on this issue because: (1) Ohio's system is rationally designed to allow local control in making decisions about services to be provided to meet perceived educational needs; (2) education is not a fundamental interest and, therefore, the financing system should not be subjected to "strict scrutiny"; and (3) even if the system is subjected to "strict scrutiny," local control is a compelling state interest justifying disparity of educational opportunity.

## THE TWO-TIERED TEST FOR APPLYING THE EQUAL PROTECTION STANDARD

The courts below applied the "two-tiered test," formulated by the United States Supreme Court to Ohio's Equal Protection Clause. Defendants allege no impropriety with the application of that test and, indeed, this court has consistently applied federal guidelines in construing the Ohio Constitution's Equal Protection and Benefit Clause. *Porter* v. *Oberlin* (1965), 1 Ohio St. 2d 143; *State, ex rel. Struble,* v. *Davis* (1937), 132 Ohio St. 555.

Simply stated, the test is that unequal treatment of classes of persons by a state is valid only if the state can show that a rational basis exists for the inequality, unless the discrimination impairs the exercise of a fundamental right or establishes a suspect classification. See, *e. g., McGowan* v. *Maryland* (1961), 366 U. S. 420, for the traditional scrutiny test; see, *e. g., Shapiro* v. *Thompson* (1969), 394 U. S. 618; *Harper* v. *Virginia Bd. of Elections* (1966), 383 U. S. 663; *Griswold* v. *Connecticut* (1965), 381 U. S. 479, for a discussion of "fundamental interest"; and see, *e. g., Graham* v. *Richardson* (1971), 403 U. S. 365; *Loving* v. *Virginia* (1967), 388 U. S. 1; *Oyama* v. *California* (1948), 322 U. S. 633. If the discrimination infringes upon a fundamental right, it becomes the subject of strict judicial scrutiny and will be upheld only upon a showing that it is justified by a compelling state interest. That is, once the existence of a fundamental right or a suspect class is shown to

be involved, the state must assume the heavy burden of proving that the legislation is constitutional. See, *e. g., Eisenstadt* v. *Baird* (1972), 405 U. S. 438, 447, footnote 7; *Dunn* v. *Blumstein* (1972), 405 U. S. 330, 342; *Memphis Am. Fed. of Teachers, Local 2032* v. *Bd. of Edn.* (C. A. 6, 1976), 534 F. 2d 699; *Tanner* v. *Weinberger* (C. A. 6, 1975), 525 F. 2d 51, 54. The preeminent consideration is that "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right." *Massachusetts Board of Retirement* v. *Murgia* (1976), 427 U. S. 307, 312. See, also, *Carey* v. *Population Services Intl.* (1977), 431 U. S. 678; *Maher* v. *Roe* (1977), 432 U. S. 464; *Zablocki v. Redhail* (1978), 434 U. S. 374. "When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Id.,* at page 388.

### (1) *STRICT SCRUTINY*

The first step in applying the "strict scrutiny test" is to determine if a "fundamental interest" is affected. The United States Supreme Court in *San Antonio Indep. School Dist.* v. *Rodriguez* (1973), 411 U. S. 1, 33, stated that:

"[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education * * * Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution."

Indeed, if this court were to accept this test, educational opportunity would be a fundamental interest entitled to strict scrutiny. However, we reject the *"Rodriguez* test" for determining which rights are fundamental. While the test may have some applicability in determining which rights are fundamental under the Constitution of the United States, it is not helpful in determining whether a right is fundamental under the Ohio Constitution. The Constitution of the United States is one of delegated powers and

all "powers not delegated to the United States, nor prohibited to the state, are reserved to the States respectively, or to the people."[2]

On the other hand, the Ohio Constitution is not one of limited powers, as it contains provisions which would be suitable for statutory enactment which are not considered fundamental to our concept of ordered liberty, e. g., workers' compensation.[3]

Furthermore, the test set out in *Rodriguez, supra,* may not even be adequate for deciding what rights are fundamental under the United States Constitution. We note with approval the analysis of the test found in *Robinson* v. *Cahill* (1973), 62 N. J. 473, 303 A. 2d 273, where the Supreme Court of New Jersey, at page 491, stated:

" [W]e have not found helpful the concept of a 'fundamental' right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez,* that a right is ' fundamental' if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, *for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment* And if a right is somehow found to be 'fundamental,' there remains the question as to what State interest is 'compelling' and there, too, we find little, if any light." (Emphasis added.)

Finally, because this cause deals with difficult questions of local and statewide taxation, fiscal planning and education policy, we feel that this is an inappropriate cause in which to invoke "strict scrutiny." This case is more directly concerned with the way in which Ohio has decid-

---

[2]Amendment X to the United States Constitution.

[3]Accord, *Olsen* v. *State, ex rel. Johnson* (1976), 276 Ore. 9, 554 P. 2d 139. The Oregon Supreme Court held that such a test was not helpful because, if it were to be applied literally, it would, for example, make the right to sell and serve liquor by the drink a fundamental interest entitled to "strict scrutiny" because it is contained in the Oregon State Constitution.

See, also, *Shofstall* v. *Hollins* (1973), 110 Ariz. 88, 515 P. 2d 590; *Thompson* v. *Engelking* (1975), 96 Idaho 793, 537 P. 2d 635.

ed to collect and spend state and local taxes than it is a challenge to the way in which Ohio educates its children.[4]

## (2) TRADITIONAL SCRUTINY

Under the traditional test of equal protection, unequal treatment of classes of persons by a state is valid if the state can show that a rational basis exists for the inequity. Ordinarily, under the rational basis requirement, any classification based "upon a state of facts that reasonably can be conceived to constitute a distinction, or differences in state policy * * *" will be upheld. *Allied Stores of Ohio* v. *Bowers* (1959), 358 U. S. 522, 530.

This court, in adopting this standard, has held that every statute is presumed constitutional and can be declared invalid only when its unconstitutionality is shown *beyond a reasonable doubt*. Paragraph one of the syllabus in *State, ex rel. Dickman*, v. *Defenbacher* (1955), 164 Ohio St. 142, states[5]:

"An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible."

It is against this standard that we must determine if a violation of the Equal Protection and Benefit Clause exists here.

Defendants admit that disparity exists in per pupil expenditures throughout Ohio's school districts. This disparity exists because of differences in property wealth and the willingness or unwillingness of voters in a particular school district to pass operating levies. However, defend-

---

[4]The granting of broad discretion as to classification by a legislature in the field of taxation has long been recognized. See *Madden* v. *Kentucky* (1940), 309 U. S. 83, 87-88; *Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973), 410 U. S. 356; *Wisconsin* v. *J. C. Penney Co.* (1940), 311 U. S. 435, 445.

[5]This court has more recently repeated the strict evidentiary test which plaintiffs must meet in *State, ex rel. Lukens*, v. *Brown* (1973), 34 Ohio St. 2d 257; *e. g.*, *State, ex rel. Jackman*, v. *Court of Common Pleas* (1967), 9 Ohio St. 2d 159; *In re Trust Estate of Ely* (1964), 176 Ohio St. 311.

ants maintain that such disparate treatment has a rational basis and that plaintiffs have failed to prove beyond a reasonable doubt that disparate treatment is arbitrary and therefore unconstitutionl. Defendants argue that Ohio's system is designed to allow local control in the making of decisions concerning the nature and extent of services to be provided to meet perceived educational needs. While assuring that all districts will have the fiscal resources to meet state minimum standards, defendants argue, that, by maintaining the ability of local school districts to tax themselves beyond the 20 mill minimum taxing level, the formula operates to retain local citizen control of education through the tax referendum. This local control, defendants maintain, allows the local citizenry to decide what type of education (beyond state required basics) is best suited for the children of their community.

We find local control to be a rational basis supporting Ohio's system of financing elementary and secondary education. By local control, we mean not only the freedom to devote more money to the education of one's children but also control over and participation in the decision-making process as to how those local tax dollars are to be spent.

The history of public education in Ohio is essentially a history of local control over education and the use of property as the primary means to finance that education. The use of land to support schools in Ohio pre-dates its admission to the Union. The Ordinance of 1785 provided that lot No. 16 of each township in the Northwest Territory be reserved for the maintenance of public schools within said township.

Pursuant to the Ohio Constitution of 1802,[e] the General Assembly in 1821 enacted a bill enabling local schools and school districts to be organized (19 Ohio Laws 51); and

---

[e]The Ohio Constitution of 1802 stated, in pertinent part:

"* * * But religion, morality and knowledge, being essentially necessary to good government and the happiness of mankind, schools and the means of instruction shall forever be encouraged by legislative provision, not inconsistent with the rights of conscience." (Article VIII, Section 3, of the Ohio Constitution of 1802.)

in 1825, the tradition of utilizing real property taxation to support public schools began when the General Assembly passed a bill directing county commissioners to levy a real property tax of one-half of one mill to support local public schools (23 Ohio Laws 36).

During the remainder of the Nineteenth Century, local property taxes continued to be the sole means of support for local public schools. However, when shifts in population due to the growth of commercial and industrial centers began to create disparities in local resources, Ohio undertook a program in 1906 calling for a large measure of state financial participation. This program was commonly referred to as "state aid for weak school districts." (98 Ohio Laws 200.) The goal of this program was to provide some minimum support to the poorer school districts. Thus, early as 1906, the Ohio General Assembly established for school funding purposes a financial partnership between state government and local school districts.

The history of educational funding in Ohio, therefore, has been an accommodation between two competing interests—the interest in local control of educational programs and the means to fund them and the interest of the state in insuring that all children receive an adequate education. This phenomenon is not peculiar to Ohio. As stated by Professor Coleman:

"The history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children." Coleman in Foreword to Strayer-Haig, The Financing of Education in the State of New York (1923), at vii.

Ohio has continued this financial partnership with local school districts until the present day. In 1935, the General Assembly enacted the first Foundation Program (116 Ohio Laws 585, 587), providing substantial financial aid to school districts. This program consisted of a flat distribution to each school district, based on average daily attendance, and "additional aid" for poorer school districts. The

"additional aid" helped equalize the funds available for each school student in all districts across Ohio.

During the 21 years the Foundation Program was in effect, it was amended numerous times, and each amendment had the effect of increasing the amount of state aid. The amount of minimum "local effort" required to be levied by local school districts in order to receive "additional aid" also was increased gradually from 3 mills to 10 mills by 1955. Despite the increase in the total amount of state aid, the percentage of state support of local school districts' total operating costs dropped considerably.

Effective in 1956, Am. S. B. No. 321 (126 Ohio Laws 288) was enacted, which changed the format of state aid from "average daily membership" to a "teacher-unit" plan of state support. That enactment increased state aid to local school districts once again.

By the 1965-1966 school year, the state was providing approximately one-third of the total operating costs, with the local property tax furnishing the remainder. The General Assembly enacted Am. Sub. H. B. No. 950 (131 Ohio Laws 2024), which resulted in increased state aid to local school districts. Further legislation in the late 1960's and early 1970's further increased state support.

In fiscal year 1975-1976, the General Assembly enacted the Equal Yield Formula contained in Am. Sub. S. B. No. 170 (see Part I, *supra*) (136 Ohio Laws 475) which provides an equal sum of money (local and state combined) on a per-pupil-per-mill basis, for each qualifying school district, *i. e.,* one that has levied 20 mills for current operating expenses. (Voted millage, millage inside the unvoted 10-mill limitation for operation and the voted millage for joint vocational school district operation are included in this requirement.) The Equal Yield Formula approach represents a continuation of the partnership between the state and the local school districts. Presently, however, state support is far greater than ever before.[7]

[7]State support was $558,958,899 in fiscal year 1971; $1,224,329,776 (including property tax relief) in fiscal year 1976; and $1,399,905,919 (including property tax relief) in fiscal year 1978. Committee Staff,

380

Therefore, Ohio has historically attempted to ameliorate disparity in the levels of expenditures without destroying the virtues of local control. The present relationship is a result of over 150 years of experience in which Ohio has continually attempted to satisfy these competing interests.

We conclude that local control provides a rational basis supporting the disparity in per pupil expenditures in Ohio's school districts. This conclusion is valid from an historical point of view, and is also supported by conventional wisdom concerning educational policy.[8] In addition to allowing people within a school district to determine how much money they are willing to devote to education, local control allows for local participation in the decision-making process that determines how these local tax dollars will be spent. Each school district can develop programs to meet perceived local needs.

We agree with the observation of Chief Justice Burger, who stated, in a dissenting opinion, in *Wright* v. *Council of the City of Emporia* (1972), 407 U. S. 451, at 478:

"Local control is not only vital to continued public support of the schools, but it is of overriding importance from an education standpoint as well. The success of any school system depends on a vast range of factors that lie beyond the competence and power of the courts. Curricular decisions, the structuring of grade levels, the planning of extracurricular activities, to mention a few, are matters lying solely within the province of school officials, who maintain a day-to-day supervision that a judge cannot. A plan devised by school officials is apt to be attuned to these highly relevant education goals * * *."

Additionally, local control also provides an oppor-

---

Education Review Committee of the Ohio General Assembly, Selected Statistics on Trends and Sources of Financial Support for Elementary and Secondary Education in Ohio.   (November 15, 1978.)

[8]See, generally, *San Antonio Indep. School Dist.* v. *Rodriguez*, 411 U. S. 1, 49-50.

In *Dayton Board of Education* v. *Brinkman* (1977), 433 U. S. 406,

tunity for "experimentation, innovation, and a healthy competition for educational excellence.'"

As did the plaintiffs in the *Rodriguez* case, *supra*, plaintiffs herein argue, that even if local control is a rational basis for disparity in funding, local control could be preserved under other financing schemes that would result in more equality in educational expenditures. As Justice Powell stated in *Rodriguez*, *supra*, at pages 50 and 51:

"While it is no doubt true that reliance on local property taxation for school revenues provides less freedom of choice with respect to expenditures for some districts than for others, the existence of 'some inequality' in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system. *McGowan* v. *Maryland*, 366 U. S. 420, 425-426 (1961). It may not be condemned simply because it imperfectly effectuates the State's goals. *Dandrige* v. *Williams*, 397 U. S., at 485. Nor must the financing system fail because, as appellees suggest, other methods of satisfying the State's interest, which occasion 'less drastic' disparities in expenditures, might be conceived. Only where state action impinges on the exercise of fundamental constitutional rights or liberties must it be found to have chosen the least restrictive alternative. Cf. *Dunn* v. *Blumstein*, 405 U. S., at 343; *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960)."

Therefore, although the Ohio system of school financing is built upon the principle of local control, resulting in unequal expenditures between children who live in different school districts, we cannot say that such disparity is a product of a system that is so irrational as to be an unconstitutional violation of the Equal Protection and Benefit

---

the Supreme Court stated:

"[L]ocal autonomy of school districts is a vital national tradition." *Brinkman*, *supra*, at page 410.

In *Thompson* v. *Engelking*, *supra* (96 Idaho 793), at page 803, it was noted that:

"'The American people made a wise choice * * * by retaining within the community, close to parental observation, the actual direction and control of the educational program.' * * *"

⁹411 U. S. , at page 50.

Clause. The Equal Yield Formula assures that each school district will receive an equal number of dollars for each mill levied up to 30 mills, regardless of the property wealth of the district. The number of dollars guaranteed per pupil at the 20 mill level has been determined by the Educational Review Committee to be sufficient to assure that all school districts are given the means to comply with the State Board of Education Minimum Standards, which describe a program of "high quality" pursuant to R. C. 3301.07(D).

### III.

The plaintiffs, as cross-appellants, seek to reverse the decision of the Court of Appeals sustaining the defendants' third assignment of error before that court, which read:

"The trial court erred by determining that R. C. 3317.-022, R. C. 3317.023(A), (B) and (C), R. C. 3317.53(A) and (B), R. C. 3317.02(E) and Section 30 of the amended substitute Senate Bill 221 violate the 'thorough and efficient system' clause of Article VI, Section 2 of the Ohio Constitution."

In sustaining that assignment of error, the Court of Appeals stated:

"The court [of common pleas] * * * overstepped its power in deciding that the finance system for public schools adopted by the General Assembly represents an 'abdication' by the Assembly of its duty under Article VI, Section 2 of the Ohio Constitution. Although exceptions have been judicially recognized, the general rule of noninterference enjoys widespread acceptance; that is, the courts have no power to enforce the mandates of the constitution which are directed at the legislative branch of the government or to control the work of the lawmakers."

Plaintiffs argue that, although Section 2 of Article VI of the Ohio Constitution which provides that "[t]he General Assembly shall make such provisions * * * as * * * will secure a thorough and efficient system of common schools throughout the state" invests the General Assembly with broad discretion in the matter of public education, the constitutional provision does not grant the Gen-

eral Assembly the exclusive authority to determine the criteria against which the exercise of that power is to be measured. They contend further that it does not disqualify the judiciary from adjudicating whether the General Assembly's attempt to formulate a plan for financing elementary and secondary education comports with the constitutional duty which devolves upon it.

The defendants, however, maintain that the issue presented here is a "political question" and, therefore, this court should refrain from addressing it. To do so, they argue, would require this court to exercise powers constitutionally committed to a coordinate branch of government.

We wish to state clearly at the outset that this court has the authority, and indeed the duty, to review legislation to determine its constitutionality under the Constitution of Ohio and to declare statutes inoperative. The doctrine of judicial review articulated by Chief Justice John Marshall in the landmark case of *Marbury* v. *Madison* (1803), 5 U. S. (1 Cranch) 137, establishes the judicial branch as the final arbiter in interpreting the Constitution.

The doctrine of judicial review is so well established that it is beyond cavil. Consider this court's opinion in *State* v. *Masterson* (1962), 173 Ohio St. 402, which states, at page 405, in part:

"It has long been an established principle of law that courts do not interfere in political or legislative matters except in those instances where legislative enactments violate the basic law. In those instances where enactments violate the basic law, it was determined early in our judicial history that the courts have not only the power but the duty to declare such enactments invalid.

"One of the basic functions of the courts under our system of separation of powers is to compel the other branches of government to conform to the basic law."

The defendants, however, while not directly attacking the doctrine of judicial review,[10] attempt to achieve a simi-

---

[10] Defendants, however, filed a motion to dismiss in the trial court based on the grounds that the court lacked jurisdiction because of the separation of powers doctrine. The trial court overruled the motion,

lar result by contending that the issue is a "political question." To support this contention defendants rely largely upon *Baker* v. *Carr* (1962), 369 U. S. 186. That portion of *Baker* quoted by the defendants would support their position. However, the language in *Baker* is not particularly persuasive.

*Baker* supplies scant support for defendants' assertion that the actions of the Ohio General Assembly acting under the aegis of the Thorough and Efficient Clause are not judicially reviewable because such review would involve a "political question." *Baker* is not controlling for the following reasons:

(1) The Supreme Court found that there was no political question involved; and, therefore, the material relied upon by the defendants is *dicta*, not the law of the case.

(2) The high court's statements in *Baker* do not represent its most recent pronouncements on the "political question" doctrine. Whatever viability this doctrine had was certainly greatly dampened by the later decision in *Powell* v. *McCormack* (1969), 395 U. S. 486, in which the court reinstated Adam Clayton Powell to membership in the House of Representatives, delineated the power of the House to review its own membership, and put to shambles any attempts by legal scholars to reconcile the court's pronouncements in this area.

We find that the issue concerning legislation passed by the General Assembly pursuant to Section 2 of Article VI of the Ohio Constitution presents a justiciable controversy. In so finding, we find the decisions of the courts in New York, New Jersey and Washington helpful. In *Robinson* v. *Cahill* (1975), 69 N. J. 133, 351 A. 2d 713; *Board of Education, Levittown Union Free School District* v. *Nyquist* (1978), 94 Misc. 2d 466, 408 N. Y. Supp. 606; and *Seattle School District No. 1* v. *State* (1978), 90 Wash. 2d 476, 585 P. 2d 71, the courts had no difficulties

and the Court of Appeals sustained the lower court citing *Marbury* v. *Madison* (1803), 5 U. S. (1 Cranch) 137.

concerning their authority to review the constitutionality of similar legislation.[11]

However, we agree with that portion of the Court of Appeals' opinion, which states: "Because this constitutional grant reenforces the ordinary discretion reposed in the General Assembly in its enactment of legislation, the judicial department of this state should exercise great circumspection before declaring public school legislation unconstitutional as a violation of Article VI, Section 2."

In recognition of the deference to be provided to the General Assembly in education matters, this court stated in *State, ex rel. Methodist Children's Home Assn.,* v. *Board of Education* (1922), 105 Ohio St. 438, 448:[12]

"* * * Pursuant to the authority so vested the legislative branch of the state has enacted the laws to which we have referred, and many others, with a view to making most adequate and satisfactory provision for the efficient education of the youth of the state. *With the wisdom or the policy of such legislation the court has no responsibility and no authority.* Its duty is limited to the interpretation of

---

[11]As stated by the Supreme Court of Washington in the *Seattle* case (585 P. 2d 71), at page 83:

"The ultimate power to interpret, construe and enforce the constitution of this State belongs to the judiciary. * * * 'Both history and uncontradicted authority make clear that "'[I]t is emphatically the province and duty of the judicial department to say what the law is.'" *United Statse* v. *Nixon* * * * [418 U. S. 683, 703 (1974)], quoting *Marbury* v. *Madison,* 5 U. S. (1 Cranch), 137, 176 * * * (1803), even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch.'" *Seattle School District No. 1* v. *Washington, supra,* at pages 83-84.

[12]Accord, *Cronin* v. *Lindberg* (1977), 66 Ill. 2d 47, 360 N. E. 2d 360, in which the Supreme Court of Illinois was confronted with the issue of whether certain statutory sections dealing with the financing of public education were compatible with the Illinois Constitution. The court, at page 58, stated:

"* * * It is not the function of this court to question the wisdom of legislation which does not contravene constitutional safeguards. * * *

"* * * This court has consistently held that the question of the efficiency of the educational system is properly left to the wisdom of the legislature."

such provisions as are not clear, and the carrying into execution of laws enacted which are not in conflict with constitutional provisions." (Emphasis added.)

To state that the General Assembly must be granted wide discretion and that it is not the function of this court to question the wisdom of the statutes, is not to say that the General Assembly's discretion in this area is absolute. In *Miller* v. *Korns* (1923), 107 Ohio St. 287, the court was confronted with a constitutional challenge to a statute authorizing funds raised by property taxation within one school district to be used to finance schools in other districts within the county. The court passed upon the constitutionality of the legislation, which was clearly related to the powers and duties of the General Assembly under Section 2, Article VI of the Ohio Constitution and upheld the statute as constitutional.

In *Miller* v. *Korns, supra*, at pages 297-298, the court made a statement concerning the "Thorough and Efficient Clause" which is highly pertinent to the case at bar:

"Section 2, Article VI of the Ohio Constitution, provides as follows:

" 'The General Assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, *will secure a thorough and efficient system of common schools throughout the state.* * * *'

"This declaration is made by the people of the state. It calls for the upbuilding of a system of schools throughout the state, and the attainment of efficiency and thoroughness in that system is thus expressly made a purpose, not local, not municipal, but state-wide.

"With this very state purpose in view, regarding the problem as a state-wide problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state.

"A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part of any number of the school districts

of the state lacked teachers, buildings, or equipment.

"In the attainment of the purpose of establishing an efficient and thorough system of schools throughout the state it was easily conceivable that the greatest expense might arise in the poorest districts; that portions of great cities, teeming with life, would be able to contribute relatively little in taxes for the support of schools, which are the main hope for enlightening these districts, while districts underpopulated with children might represent such taxation value that their school needs would be relatively over supplied."[13]

This court, therefore, intimated in *Miller* v. *Korns, supra*, that the wide discretion granted to the General Assembly is not without limits. For example, in a situation in which a school district was receiving so little local and state revenue that the students were effectively being deprived of educational opportunity,[14] such a system would clearly not be thorough and efficient.

We find, however, that the General Assembly has not so abused its broad discretion in enacting the present system of financing public education as to render the statutes in question unconstitutional. To the extent that the Equal Yield Formula's guarantee at 20 mills is sufficient to en-

---

[13]Paragraphs one and two of the syllabus in *Miller, supra,* provide:

"1. Sections 7575 and 7600, General Code (109 O. L., 148 and 149), providing for a tax levy of 2 65/100 mills, the proceeds of which are to be retained in the several counties of the state for support of the schools thereof, and for the apportionment thereof, are valid and constitutional, not repugnant to the federal and state Constitutions, nor to any limitation contained in either.

"2. Under Section 2, Article VI of the Ohio Constitution, making it mandatory upon the General Assembly to make such provisions by taxation or otherwise as will secure a thorough and efficient system of common schools throughout the state, appropriation by the Legislature of funds raised in one school district to the needs of other school districts is made in pursuance of a legitimate state and public purpose, and not in pursuance of a local or private purpose."

[14]See *San Antonio Indep. School Dist.* v. *Rodriguez, supra,* at page 25, where the United States Supreme Court stated that absent "absolute deprivation of education" the taxation system of financing public education was not unconstitutional.

sure that each child receives an adequate education, the system devised by the General Assembly is constitutional within Section 2, Article VI of the Ohio Constitution. The "Equal Yield Formula" attempts to establish a funding floor, at 20 mills, that is sufficient to assure that each school district has the means to comply with state minimum standards. Although plaintiffs attempt to equate school closings with "educational deprivation," the uncontroverted fact is that school districts' calendar adjustments (school closings) have never resulted in any student receiving less than the full 182 days of instruction per year as required by R. C. 3313.48. Also, the record reveals that several urban school districts that claim to be "starved for funds" in fact offer programs and services in excess of state minimum standards.

The fact that a better financing system could be devised which would be more efficient or more thorough is not material.

## IV.
### STANDING

The defendants argue that the Cincinnati Board of Education, its members and administrative officials, lack standing to litigate this cause. This issue does not merit extended analysis. Defendants have not challenged the standing of the students who attend schools in the Cincinnati School District and similarly situated school districts in Ohio. Therefore, even if these statutory plaintiffs were found to lack standing, it is reasonable to assume that the constitutional questions raised in this action would nevertheless be pursued by the students and parents without the participation of the other plaintiffs. As the Court of Appeals stated of this issue: "The assignment seems [to be] 'much ado about nothing.'" Even the defendants in their brief admit that "[they] do not advance this assigned error as dispositive of the issue of this case." Also they concede that "the issue of standing is secondary to the paramount issue [in the case]."

The judgment of the Court of Appeals that the Ohio statutory system for financing elementary and secondary

education violates Section 2, Article I of the Ohio Constitution is reversed. The judgment of the Court of Appeals that the Ohio statutory system for financing elementary and secondary education does not violate Section 2, Article VI of the Ohio Constitution is affirmed.

For the reasons stated herein, the judgment of the Court of Appeals is reversed in part and affirmed in part.

*Judgment reversed in part and affirmed in part.*

CELEBREZZE, C. J., HERBERT, P. BROWN, SWEENEY and HOLMES, JJ., concur.

LOCHER, J., dissenting. I dissent from the judgment of the majority, holding that Ohio's statutory system for the financing of elementary and secondary education does not violate the Ohio Constitution. In my view, the present system violates both the Equal Protection and Benefit Clause of Section 2 of Article I, and the "Thorough and Efficient Clause," Section 2, Article VI of the Ohio Constitution.

I.

First, I respectfully disagree with the majority's conclusion to the effect that educational opportunity is not a fundamental right and, therefore, not entitled to strict judicial scrutiny under Equal Protection analyses. The Supreme Court stated, in *San Antonio School Dist.* v. *Rodriguez* (1973), 411 U. S. 1, 33, that:

"* * * [T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education * * *. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. * * *"

The right to an education is implicitly mandated by Sections 2 and 3 of Article VI of the Ohio Constitution, as follows:

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from

the school trust fund, *will secure a thorough and efficient system of common schools throughout the state;* but no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state.'' (Emphasis added.) Section 2, Article VI.

''Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds; provided, that each school district embraced * * * within any city shall have the power * * * to determine * * * the number of members and the organization of the district board of education * * *.'' Section 3, Article VI.

Applying the *"Rodriquez test,"* it follows that, in Ohio, educational opportunity is a fundamental interest entitled to strict scrutiny under Ohio's Equal Protection Clause. California, Connecticut, and Wisconsin have found educational opportunity to be a fundamental interest under the *"Rodriguez* test.'' *Serrano* v. *Priest* (1976), 18 Cal. 3d 728, 557 P. 2d 929; *Horton* v. *Meskill* (1977), 172 Conn. 615, 376 A. 2d 359; *Buse* v. *Smith* (1976), 74 Wis. 2d 550, 247 N. W. 2d 141.[15]

Over and above the *Rodriquez* test, I would find educational opportunity to be a fundamental right because of its nexus to the right to participate in the electoral process and to the rights of free speech and association guaranteed by the First Amendment.

Finally, the provision of public education is the single most important function of our state. Education is at the very foundation of our democracy and ''it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an [adequate] educa--

---

[15]In *Robinson* v. *Cahill* (1973), 62 N. J. 473, 303 A. 2d 273, the New Jersey Supreme Court, although not applying the *"Rodriguez* test,'' went on to find their system of financing education in New Jersey unconstitutional because it violated the "Thorough and Efficient Clause," a provision identical to Ohio's "Thorough and Efficient Clause." On rehearing to determine a remedy, however, the court stated that the right of children to a thorough and efficient *education is a fundamental right* guaranteed by the state constitution and, therefore, must be administered equally. *Robinson* v. *Cahill* (1975), 69 N. J. 133, 351 A. 2d 713.

tion." *Brown* v. *Board of Education* (1954), 347 U. S. 483, 493. In this sense, the fundamental right to equal educational opportunity is the American Dream as incarnate as constitutional law.

The American Dream is thwarted by the archaic and unconstitutional statutory system of financing elementary and secondary education. Evidence abounds that Ohio's beleaguered schools are overwhelmed by problems of such magnitude that the basic needs of pupils go unfulfilled. The majority opinion flies square in the face of reality, not to mention the findings of fact and legal conclusions of the trial court and the Court of Appeals.

In determining whether unequal educational opportunity exists among Ohio's school age children, this court is constrained by the nearly 400 page findings of fact of the trial court. These findings were adopted in their entirety by the Court of Appeals. This court has stated on many occasions that the court will not weigh the evidence to determine whether correct conclusions as to facts were reached by the court below. *State, ex rel Pomeroy,* v. *Webber* (1965), 2 Ohio St. 2d 84, 86, citing *State, ex rel. Kobelt,* v. *Baker* (1940), 137 Ohio St. 337, 340; accord, *G. S. T.* v. *Avon Lake* (1976), 48 Ohio St. 2d 63, 65, at fn. 2; *In re Estate of Duiguid* (1970), 24 Ohio St. 2d 137, 141. The only exception to this rule is where there is no evidence in the record of probative value to support them. *Gillen-Crow Pharmacies, Inc.,* v. *Mandzak* (1966), 5 Ohio St. 2d 201, 205; *Gates* v. *Board of Edn. of River Local School Dist.* (1967), 11 Ohio St. 2d 83. At no time has the appellant alleged that any of the approximately 400 page findings of the trial court are unsupported by the 7,500 page record.

There is a clear connection between the meager financial resources and the general malais of many schools, particularly those located in urban areas of the state.[16]

---

[16]"(G) Conditions in Urban Districts

"(1) The same conditions of educational deprivation existing in the audit districts, which, with the exception of Toledo, are essentially rural, also exist in the principal urban, inner-city districts. * * *" Findings of Fact and Conclusions of Law, at page 93.

Problems associated with discipline; inadequate salaries; lack of textbooks; cramped facilities and outmoded equipment;[17] vandalism; low teacher morale; ebbing parental concern; demoralized non-teacher employees; payless pay days; absenteeism and truancy; consistent failures of school tax levies and bond issues;[18] record teacher resignations; desultory pupil achievement and many others are directly traceable to Ohio's inequitable system of funding. The voluminous trial record is replete with evidence substantiating the ills that threaten to engulf the schools and the linkage between those symptoms and the emaciated proceeds of Ohio's funding statutes.[19]

The defendants, acknowledging that wide disparity in educational funding exists among Ohio's 617 school districts, argue that, even if this court finds educational opportunity to be a fundamental right, "local control" is a

---

[17]"(E) Educational Conditions in Closing Audit Districts
"* * *

"(4) The physical plants in a school district are substantially educationally significant. Obsolete, poorly lighted, inadequately maintained school buildings impair teaching and learning efficiency and have a negative effect upon student morale and motivation." Findings of Fact and Conclusions of Law, at page 72.

[18]"(3) The evidence that the local property tax component of the system has utterly failed is overwhelming. Superintendent after superintendent of school districts which have been driven to closing or to the brink of closing schools for lack of funds testified to histories of consistent failures of school tax levies and school bond issues." Findings of Fact and Conclusions of Law, at page 186.

[19]"(9) Many of the districts have been forced to borrow from commercial banks and from bond retirement accounts, and have had to defer the payment of bills until the next school year.

"(10) The superintendents anticipate that the financial problems of their districts will become even worse in 1977 than they were in 1976, that the deficits will become larger and that their schools will have to be closed for longer periods in 1977 than they were in 1976.

"(11) School closings place districts in deeper financial holes because they incur additional costs for unemployment compensation, interest and make-up days.

"(12) The additional cost to the Toledo City District in unemployment compensation alone as a result of the 1976 closing was $1.5 million." Findings of Fact and Conclusions of Law, at page 62.

compelling state interest justifying the grossly unequal treatment of Ohio's school age children. Although local control may be a rational basis justifying the present system, it is clearly not compelling. Whatever may be said about "local control," the evidence shows that the present system has actually eroded such control; i. e., poorly funded districts are not even able to offer adequate programs required by the state's own "minimum standards," let alone design programs to meet the individualized needs of the children within their district. Many experts testified that increased state funding would enhance local control.

Repeated allusions by the majority to the foresight of the legislators who framed our laws establishing local control of the public education process is scant solace to the pupil, teacher or administrator in the embattled schools. Indeed, many who feel that local control of the operations is necessary to accomplish a viable school system fear that the growing difficulties attacking the schools may bring about the demise of our educational system as we know it. Surely, desperate pleas for financial transfusion will go out to the federal bureaucratic establishment. When, and if, the calls for help are heeded, the strings that accompany the federal largesse will erode the cherished ideal of district control. Better the General Assembly shore up the disadvantaged school and, in the process, save the expressed community interests of our people.[20]

More importantly, Section 2, Article VI, places the primary responsibility for the education of our school age children *upon* the state of Ohio, *not* the local school district. Local control, therefore, cannot be utilized to justify the present system which creates: (1) vast disparities among Ohio's school districts in (a) total state and local support per pupil and (b) expenditures per pupil for instruction, and (2) the quantity and quality of educational services pro-

---

[20] "(3) The failure of the General Assembly to make provisions for the plants and facilities of the school districts represents an omission to provide for one of the essential elements of the public educational system." Findings of Fact and Conclusions of Law, at page 204.

vided. The fact that many districts were forced to close their schools, for varying periods of time, in 1976, 1977 and 1978, and that many districts which avoided closing in 1978 were unable to deliver better than austerity levels of education, is a deplorable situation which cries out for a remedy. A loss of a day of instruction can never be recaptured.

## II.

Second, while the General Assembly must be afforded broad discretion in establishing a "thorough and efficient system of common schools," in my view, it abuses that discretion where many school districts are so "starved for funds" that they are unable to comply with the state's own "minimum standards," and are unable to remain open for the entire school year without interruption.[21] The trial court specifically held that "[t]he significance of the evidence of non-compliance by schools with state minimum standards is that the General Assembly has established a system of common schools throughout the state in which the overwhelming majority of schools are substandard as measured by the state's own criteria." Findings of Fact and Conclusions of Law, at page 56.

Therefore, to the extent that some children are forced to attend schools which are so poorly funded that they cannot meet state "minimum standards," they are being deprived of educational opportunity. Such a system is not "thorough and efficient."

---

[21]In 1976, 17 of Ohio's school districts were forced to apply to the State Auditor for closing audits, pursuant to R. C. 3313.483. Seven "audit" districts actually closed.

In 1977, 51 school districts were forced to apply for closing audits under R. C. 3313.483, and the results of the audits showed that 33 of the districts would have had deficits if they completed the school year.