[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Walgate v. Kasich,* Slip Opinion No. 2016-Ohio-1176.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1176

THE STATE EX REL. WALGATE ET AL., APPELLANTS, *v*. KASICH, GOVERNOR, ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Walgate v. Kasich,* Slip Opinion No. 2016-Ohio-1176.]

*Challenges to constitutionality of Article XV, Section 6 of the Ohio Constitution, 2009 Am.Sub.H.B. No. 1, 2010 Am.Sub.H.B. No. 519, and 2011 Sub.H.B. No. 277—Court of appeals' judgment upholding dismissal of several plaintiffs' claims for lack of standing affirmed—Allegations by plaintiff in support of equal-protection claim were sufficient to survive motion to dismiss for lack of standing.*

(No. 2013-0656—Submitted June 23, 2015—Decided March 24, 2016.)

APPEAL from the Court of Appeals for Franklin County, No. 12AP-548, 2013-Ohio-946.

_____

**FRENCH, J.**

{¶ 1} This action raises a variety of challenges to recently enacted legislation and administrative rules related to gambling in the state, both at casinos and at race tracks, but the questions before us involve only the existence or nonexistence of standing and the requirements for a trial court to dismiss a complaint for lack of standing. We conclude that one plaintiff-appellant has standing to maintain this action, but the other plaintiffs-appellants do not.

*I. Case background*

{¶ 2} This appeal involves numerous constitutional provisions, statutes, administrative rules, and claims. Yet because of the case's procedural posture, only a limited portion of the underlying dispute is now before us. To fully understand the relevant issue, a brief review of the relevant law and the underlying facts is necessary.

*A. State constitutional provisions*

{¶ 3} Article XV, Section 6(A) of the Ohio Constitution establishes the General Assembly's authority with respect to lotteries:

> The General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided that the entire net proceeds of any such lottery are paid into a fund of the state treasury that shall consist solely of such proceeds and shall be used solely for the support of elementary, secondary, vocational, and special education programs as determined in appropriations made by the General Assembly.

{¶ 4} Article XV, Section 6(C)(1) of the Ohio Constitution permits limited casino gambling in the state:

> Casino gaming shall be authorized at four casino facilities (a single casino at a designated location within each of the cities of Cincinnati, Cleveland, and Toledo, and within Franklin County) to create new funding for cities, counties, public school districts, law enforcement, the horse racing industry and job training for Ohio's workforce.

The remaining provisions of Article XV, Section 6(C) detail other procedures related to casino gambling, including how casino revenue will be taxed, how that revenue will be distributed, how the state will oversee casino gambling, and how casino licenses will be obtained.

*B. Legislative enactments and administrative provisions*

**{¶ 5}** In 2009, pursuant to its power to authorize agencies of the state to conduct lotteries, the General Assembly approved 2009 Am.Sub.H.B. No. 1 ("H.B. 1"), which authorized the Ohio Lottery Commission to operate video lottery terminal ("VLT") games, and, in turn, the commission issued administrative rules to implement operation of VLTs. Ohio Adm.Code 3770:2-1 et seq. These rules limited those who could obtain licenses for VLTs to those with a permit to conduct horse races. Ohio Adm.Code 3770:2-3-01.

**{¶ 6}** In 2010, the General Assembly enacted 2010 Am.Sub.H.B. No. 519 ("H.B. 519"), which, in part, extended the period of time for casino operators to make their initial investments required by Article XV, Section 6(C)(5) of the Ohio Constitution. R.C. 3772.27. And in 2011, the General Assembly enacted 2011 Sub.H.B. No. 277 ("H.B. 277"). As relevant to this appeal, H.B. 277 amended R.C. 5751.01(F)(2)(hh) and 5753.01(D) to exclude certain amounts collected by casino operators from the commercial-activity tax imposed by R.C. 5751.02; amended R.C. 3772.01, 5751.01, and 5753.01 and enacted R.C. 3772.34 to institute changes

to the collection and distribution of taxes on casino revenues; and amended R.C. 3772.27 to refine the procedure for opening and operating casino facilities.

*C. Procedural history*

{¶ 7} In October 2011, plaintiffs-appellants, Robert L. Walgate Jr., David P. Zanotti, the American Policy Roundtable ("Ohio Roundtable"), Sandra L. Walgate, Agnew Sign & Lighting, Inc. ("ASL"), Linda Agnew, Paula Bolyard, Jeffrey Malek, Michelle Watkin-Malek, Thomas W. Adams, and Donna J. Adams, filed a complaint in the Franklin County Court of Common Pleas seeking a declaratory judgment, injunctive relief, and a writ of mandamus. In January 2012, those parties, along with plaintiffs-appellants, Joe Abraham and Frederick Kinsey, filed an amended complaint in the case. The amended complaint named as defendants (appellees here) Governor John R. Kasich; the State Lottery Commission; the interim director and members of the State Lottery Commission; the Casino Control Commission; the chairman, vice chairman, executive director, and members of the Casino Control Commission; and Ohio Tax Commissioner Joseph W. Testa (collectively, "the state").

{¶ 8} The amended complaint raises 17 claims. The first ten claims relate to the constitutionality of VLTs and H.B. 1, the act that authorized them. Those claims allege, in part, that (1) VLT operation exceeds the state's authority to conduct lotteries, (2) the lottery commission will violate the constitution by not conducting VLT games in their entirety, (3) the net proceeds of VLT games will be distributed in an unconstitutional manner, (4) allowing VLTs to be operated by racing facilities will violate the prohibition against the state's financial involvement in private enterprise, (5) H.B. 1 violates the one-subject rule of Article II, Section 15(D) of the Ohio Constitution, and (6) in enacting H.B. 1 the General Assembly failed to comply with the requirement in Article II, Section 15(C) of the Ohio Constitution that each House consider every bill on three different days.

4

**{¶ 9}** Claims 11 through 16 in the amended complaint challenge legislative actions that relate to Ohio's four casinos, particularly H.B. 277 and H.B. 519. Included in these are claims that legislation pertaining to the commercial-activity tax, casino-license fees, and tax exclusion for promotional gaming credits, as well as legislation allowing for multiple casino facilities in one city and graduated payments of the required initial investment, exceeded the legislature's constitutional authority.

**{¶ 10}** The final claim in the amended complaint is that Article XV, Section 6 of the Ohio Constitution, H.B. 1, H.B. 277, and H.B. 519 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by granting a monopoly to the gaming operators whom the state approved.

**{¶ 11}** Appellants sought a variety of relief in their amended complaint, including declarations that portions of H.B. 1, H.B. 277, and H.B. 519 violate the Ohio Constitution; preliminary and permanent injunctions enjoining the state from implementing H.B. 1; peremptory or other writs of mandamus ordering that VLTs be conducted solely by the state for the benefit of education programs in Ohio; preliminary and permanent injunctions enjoining the state from implementing portions of H.B. 277 and H.B. 519; peremptory or other writs of mandamus ordering the state to ensure that casino operators will be subject to the commercial-activity tax and the taxes and licensing fees set forth in Article XV, Section 6(C) of the Ohio Constitution; and a declaration that Article XV, Section 6 of the Ohio Constitution, H.B. 1, H.B. 277, and H.B. 519 violate the Fourteenth Amendment to the United States Constitution.

**{¶ 12}** Motions to intervene were filed by gaming operators Raceway Park, Inc.; HJC/PDC Holdings, L.L.C.; Central Ohio Gaming Ventures, L.L.C.; Toledo Gaming Ventures, L.L.C.; Rock Ohio Caesars, L.L.C.; Rock Ohio Caesars Cleveland, L.L.C.; Rock Ohio Caesars Cincinnati, L.L.C.; Thistledown Racetrack, L.L.C.; Northfield Park Associates, L.L.C.; Lebanon Trotting Club, Inc.; MTR

Gaming Group, Inc.; and PNK (Ohio), L.L.C. (collectively, "gaming operators"). The gaming operators also filed motions for judgment on the pleadings.

{¶ 13} The state moved the trial court to dismiss this action pursuant to Civ.R. 12(B)(6) for lack of standing and for failure to state a claim upon which relief can be granted.

*D. Trial court decision*

{¶ 14} The trial court granted the state's motions to dismiss. It concluded that none of the appellants had standing either as a general citizen or as a taxpayer. It also determined that no appellant had standing based on his, her or its status as a contributor to the commercial-activity tax, as a teacher or parent of students in the public-school system, as an individual suffering from or related to those suffering from the effects of gambling addiction or as an individual desiring to be a casino operator in the state. In analyzing these standing claims, the trial court concluded that appellants had not shown that they had suffered or been threatened with direct or concrete injuries different from those of the general public or that the requested relief would redress their injuries. Because no individual member of Ohio Roundtable was shown to have standing, the court also concluded that Ohio Roundtable lacked organizational standing. After determining that appellants lacked standing, the trial court found that the gaming operators' motions for judgment on the pleadings were moot.

*E. Court of appeals' decision*

{¶ 15} The Tenth District Court of Appeals affirmed the trial court's judgment. The Tenth District noted that appellants asserted five theories in support of standing:

> (1) gambling's negative effects constitute injury in fact, (2) taxpayer standing based on the adverse effect to special funds, (3) standing due to adverse effects by diversion of funds from schools and local

6

governments, (4) standing under traditional public duty laws, and (5) standing based on Kinsey's alleged "denial of equal treatment" resulting from the laws limitation of casino gambling to certain entities.

2013-Ohio-946, 989 N.E.2d 140, ¶ 14 (10th Dist.). The court concluded that appellants had not established "private standing because they have not suffered [and] are not threatened with any direct and concrete injury in a manner or degree different from that suffered by the public in general." *Id*. at ¶ 16. The court further concluded that appellants had not established standing under the "public right" exception, which allows for issues of great public importance and interest to be resolved in an action that involves no rights or obligations peculiar to the named parties, as recognized in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999). The Tenth District also rejected appellants' argument that the trial court erred in dismissing their claims without allowing them to file an amended complaint to plead additional facts in support of standing.

*F. Issues presented on appeal*

{¶ 16} We accepted appellants' discretionary appeal and held the case for our decision in *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101. 136 Ohio St.3d 1449, 2013-Ohio-3210, 991 N.E.2d 256. After we announced our decision in *ProgressOhio.org*, we granted appellees' joint motion to dismiss the appeal as having been improvidently accepted as to proposition of law No. I,[1] 140 Ohio St.3d 1412, 2014-Ohio-3785, 15 N.E.3d 881, and ordered briefing on the remaining three propositions:

---

[1] The first proposition of law provided: "Ohio citizens have standing to pursue claims seeking enforcement of public duties by public officials under the lottery and casino provisions of the Ohio Constitution by reason of their interest in the execution of the laws of this state."

Proposition of Law No. II: Parties whose interests are adversely affected by the negative effects of unconstitutional gambling have standing to pursue claims of violations of the lottery and casino provisions of the Ohio Constitution.

Proposition of Law No. III: Parents of public school students and contributors to special funds for schools have standing to pursue claims of unconstitutional diversion of lottery proceeds and casino tax proceeds from education or school funds.

Proposition of Law No. IV: In order for a court to dismiss a complaint for failure to state a claim for lack of standing (Civ.R. 12(b)(6)), it must appear beyond doubt from the complaint and standing affidavits that the plaintiff can prove no set of facts entitling him to relief. In the event of such dismissal, a court must allow an opportunity to amend the complaint.

*II. Analysis*

{¶ 17} We begin our analysis by noting that appellants' merit brief contains some arguments that extend beyond the scope of the three propositions of law on which we ordered briefing, most notably appellants' assertions that they have shown standing based on their status as "beneficially interested" parties and that this court "has original jurisdiction as necessary to complete a determination of this cause with respect to the issue of appellants' citizen standing to seek mandamus relief." This court generally declines to address issues associated with propositions of law that we have declined to review and issues that appellants did not properly raise. *See Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, ¶ 3, fn. 2. Accordingly, we confine our analysis to the issues we accepted for review: (1) whether appellants have

standing arising from their interests being negatively affected by gambling, (2) whether appellants have standing arising from their ties to public schools or contributions to special funds, (3) whether Kinsey sufficiently alleged standing to raise his equal-protection challenge, and (4) whether a trial court has a duty to allow plaintiffs an opportunity to amend a complaint before dismissing a case for failure to show standing.

*A. Standing generally*

{¶ 18} "It is well established that before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue." *Sheward*, 86 Ohio St.3d at 469, 715 N.E.2d 1062, citing *Ohio Contrs. Assn. v. Bicking*, 71 Ohio St.3d 318, 320, 643 N.E.2d 1088 (1994). "The essence of the doctrine of standing is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.' " *Racing Guild of Ohio, Local 304 v. Ohio State Racing Comm.*, 28 Ohio St.3d 317, 321, 503 N.E.2d 1025 (1986), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Under traditional standing principles, a plaintiff must show, at a minimum, that he has suffered " '(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief.' " *ProgressOhio.org, Inc.,* 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, at ¶ 7, quoting *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 22. For common-law standing, a party wishing to sue must have a "direct, personal stake" in the outcome of the case; "ideological opposition to a program or legislative enactment is not enough." *Id.* at ¶ 1.

{¶ 19} Absent statutory authority, a taxpayer lacks standing "to institute an action to enjoin the expenditure of public funds unless he has some special interest therein by reason of which his own property rights are placed in jeopardy." *State*

*ex rel. Masterson v. Ohio State Racing Comm.*, 162 Ohio St. 366, 123 N.E.2d 1 (1954), paragraph one of the syllabus. "In other words, private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally." *Id.* at 368, citing 39 Ohio Jurisprudence, Section 12, at 22, and 52 American Jurisprudence, Section 3, at 3. A plaintiff does not have standing to challenge expenditures from the general revenue fund simply based upon the plaintiff's contributions to the general revenue fund as a taxpayer. *Gildner v. Accenture, L.L.P.*, 10th Dist. Franklin No. 09AP-167, 2009-Ohio-5335, ¶ 20.

*B. Alleged standing arising from the effects of gambling*

{¶ 20} Appellants argue that Robert Walgate Jr., Sandra Walgate, Abraham, Zanotti, and Ohio Roundtable have standing on the ground that unconstitutional gambling adversely affects them, their communities, and Ohio Roundtable's members. Specifically, they assert that Robert Walgate Jr. is a recovering gambling addict whose addiction has caused great distress and hardship to his family, that Sandra Walgate and her family have suffered great emotional and financial stress because of her son's gambling addiction, and that Abraham and Zanotti will be negatively affected by the opening of a casino in their community of Cleveland and Cuyahoga County.

{¶ 21} In support of their arguments regarding standing arising from the alleged negative effects of gambling, appellants rely on the affidavits of Dr. Valerie C. Lorenz and Zanotti. Lorenz's affidavit states that compulsive or pathological gambling is "an uncontrollable urge to gamble despite negative consequences or a desire to stop," that the expansion of legalized gambling has resulted in more compulsive gamblers in the United States, and that slot machines are the most addictive form of gambling. The affidavit offers the American Psychiatric Association's definition of pathological gambling and a list of negative effects of gambling for pathological gamblers and their families from its *Diagnostic and*

*Statistical Manual of Mental Disorders.* Zanotti's affidavit makes various statements about the history of gambling in Ohio, alludes to unspecified "significant societal problems directly connected" to gambling addiction, and states that the government's "extra-legal activity" related to gambling expansion in Ohio violates the Ohio Constitution and defrauds the public.

{¶ 22} The negative effects of gambling that appellants allege do not constitute concrete injuries to appellants that are different in manner or degree from those caused to the general public, were not caused by the state's conduct, and cannot be redressed by the requested relief.

{¶ 23} This case differs from cases challenging gambling laws in which standing was found to exist. For example, in *Patchak v. Salazar*, 632 F.3d 702 (D.C.Cir.2011), *aff'd*, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, ___ U.S. ___, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012), the plaintiff sued the Secretary of the Interior, alleging that he lived near land that the secretary had decided to hold in trust for the construction and operation of a gaming facility. *Id.* at 703. Among the factors supporting standing were that the gaming facility would attract 3.1 million visitors per year, destroying the peace and quiet of the area; that there would be increased pollution and crime in the rural farming community; and that the facility would divert police and medical resources in the area. *Id.* at 703-704. The secretary did not challenge the plaintiff's standing under Article III of the United States Constitution, but the court found "no doubt" that the plaintiff satisfied the requirements for standing. *Id.* at 704. The test for Article III standing, like the test for common-law standard in Ohio, requires an injury in fact, causation, and redressability. *Amador Cty. v. Salazar*, 640 F.3d 373, 378 (D.C.Cir.2011), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Specifically, the court stated that the impact of the proposed gaming facility on the plaintiff's way of life constituted an injury in fact that was traceable to the

secretary's decision and that could be redressed with an injunction preventing gaming on the property. *Patchak* at 704.

{¶ 24} Similarly, in *Amador Cty.*, the county sued the Secretary of the Interior, challenging the secretary's approval of a compact between an Indian tribe and the state that would allow gambling on land in the county. Both the district court and the circuit court rejected the secretary's argument that the county lacked standing. *Id*. at 378-379. The circuit court found that an injury in fact existed because the planned gaming facility would increase the county's infrastructure costs and affect the character of the community. *Id*. at 378. The court also found that the causation and redressability elements of standing were met because the county had alleged a direct causal connection between the secretary's approval of the Indian tribe's compact with the state and the alleged harm, which would be remedied if the compact were rejected. *Id*.

{¶ 25} The plaintiffs in *Patchak* and *Amador Cty.* articulated direct, concrete harm different from that which the general public would experience. This is the same standard for establishing injury that must be met under our precedent. For example, in *Willoughby Hills v. C. C. Bar's Sahara, Inc.*, 64 Ohio St.3d 24, 27, 591 N.E.2d 1203 (1992), which involved a challenge to a board of zoning appeals decision, we explained our prior holding in *Schomaeker v. First Natl. Bank of Ottawa*, 66 Ohio St.2d 304, 421 N.E.2d 530 (1981), that a contiguous property owner was directly affected by a village planning commission's order granting a use variance and, therefore, had standing to seek review of the commission's order. We stated as follows:

> The private litigant has standing to complain of harm which is unique to himself. In contrast, a private property owner across town, who seeks reversal of the granting of a variance because of its effect on the character of the city as a whole, would lack standing

> because his injury does not differ from that suffered by the community at large. The latter litigant would, therefore, be unable to demonstrate the necessary unique prejudice which resulted from the board's approval of the requested variance.

*Willoughby Hills* at 27.

{¶ 26} Unlike the plaintiffs in *Patchak* and *Amador Cty.*, appellants in this case have not pled concrete harm or injury different in manner or degree from that suffered by the general public, as contemplated by our example from *Willoughby Hills*. Whereas the federal cases set forth concrete examples of harm that would be caused by the proposed gambling facilities—i.e., that millions of new visitors would fundamentally alter a landowner's rural property and that economic damages would necessarily result from the county's increased infrastructure costs— appellants offer no examples of any particularized harm beyond bare assertions that they and their families have suffered emotional and financial distress because of gambling issues. Such general, unspecific allegations fail to establish a direct, personal interest different from the concerns shared by the general public. Rather, appellants' alleged "interest in being protected from the negative effects of unauthorized gambling" is an interest shared by the general public. Their allegation of that interest does not establish that appellants have a different, direct, personal stake in the outcome of the case, which we have held to be required for traditional standing. *Sheward*, 86 Ohio St.3d at 469-470, 715 N.E.2d 1062; *Ohio Trucking Assn. v. Charles*, 134 Ohio St.3d 502, 2012-Ohio-5679, 983 N.E.2d 1262, ¶ 7. Accordingly, appellants cannot show that they have satisfied the first factor to establish standing.

{¶ 27} Appellants also fail to show how their alleged injuries are traceable to the state's allegedly unlawful conduct. In *Patchak* and *Amador Cty.*, the alleged injuries could be traced to decisions made by the Secretary of the Interior. And in

each case, a reversal or nullification of the secretary's decision would redress the plaintiff's alleged injury. Here, the alleged injuries are general and were not caused by the state or gaming operators. Appellants fail to meet the causation element of standing because any alleged negative effects of gambling on individuals and the general community originated before the state did anything in response to the voters' approval of Article XV, Section 6(C) of the Ohio Constitution. For this reason, appellants also fail to meet the third element of standing, redressability. Even if the state's actions were nullified, the alleged general negative effects of gambling would continue to exist.

{¶ 28} The Lorenz and Zanotti affidavits also fail to support appellants' arguments. The conclusory statements within the affidavits do not show any injury peculiar to appellants, any causal link between the injuries alleged and the state's actions or how the requested relief would redress the alleged injuries.

{¶ 29} For these reasons, we affirm the Tenth District's holding that appellants have failed to establish standing arising from certain appellants' status as individuals who have experienced the negative effects of gambling. We decline to adopt appellants' second proposition of law.

*C. Alleged standing arising from status claimed with reference to schools*

{¶ 30} Appellants' third proposition of law involves two distinct arguments. First, appellants argue that they have standing because one appellant is a public-school teacher and other appellants are parents of public-school students who are interested in ensuring that lottery and casino funds are dedicated to educational use. Second, appellants assert that they have standing because some appellants contribute to the commercial-activity tax and have an interest in ensuring that commercial-activity tax funds are properly allocated to education. We address each argument in turn.

14

*1. Standing as parents and a teacher of public-school students*

{¶ 31} Appellants assert that Bolyard, Jeffrey Malek, Michelle Watkin-Malek, Thomas W. Adams, and Donna J. Adams are parents of public-school students and that Sandra L. Walgate is a public-school teacher, all of whom have standing based on their particular interest in preventing the unconstitutional diversion of lottery and casino proceeds from funds dedicated to educational use. In particular, they claim that funds that should go to schools have been redirected and that net proceeds of lotteries are being distributed to gambling interests instead of educational programs as required by the Ohio Constitution.

{¶ 32} Appellants rely on two of our decisions to support this standing argument: *Cincinnati School Dist. Bd. of Edn. v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), and *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997). In *Walter*, we held that the statutory system for financing Ohio's public schools did not violate the Ohio Constitution. *Walter* at syllabus. Eighteen years later, in *DeRolph*, however, we held that specific portions of Ohio's public-schools financing system were unconstitutional. *DeRolph* at syllabus. The plaintiffs in *Walter* included public-school students and their parents, *Walter* at 368-369, and the plaintiffs in *DeRolph* included public-school "teachers, pupils, and next friends," *DeRolph* at 193. But *Walter* and *DeRolph* do not support appellants' argument that they have standing, either as parents of public-school students or as a public-school teacher. The issue of the plaintiffs' standing was not raised in either *Walter* or *DeRolph*, and we accordingly made no statement of law in those cases relevant to the issue presented here. Rather, in both cases, the limited discussion on jurisdiction involved only political-question, separation-of-powers, and judicial-review issues, none of which was raised here. Moreover, we decided those cases well before clarifying the law regarding standing in *ProgressOhio.org*, which is directly pertinent to the issues in this case.

**{¶ 33}** The parent and teacher appellants have not alleged a direct, personal stake in the outcome of the case sufficient to establish an injury under the first element of our standing analysis. Many members of the general public who are neither parents of public-school students nor public-school teachers contribute to the funding of public schools in one form or another. Appellants' interest in ensuring that the public-school system receives the proper funds is shared by the general public.

**{¶ 34}** For these reasons, we reject the argument that certain appellants have standing as parents and a teacher of public-school students.

### 2. *Standing as contributors to special funds for schools*

**{¶ 35}** Appellants' second argument under the third proposition of law is that ASL and Agnew, as the owner of ASL, have standing as contributors to special funds for schools to pursue claims of unconstitutional diversion of lottery proceeds and casino tax proceeds from education or school funds. The only allegation in the amended complaint related to ASL's standing is that the corporation "pays the commercial activity tax on its income into the Ohio School District Tangible Tax Replacement Fund and the Ohio Local Government Tangible Property Tax Replacement Fund." It is undisputed that the funds collected from the commercial-activity tax are allocated in part to the school-district tangible-property-tax replacement fund and the Ohio local-government tangible-property-tax replacement fund. R.C. 5751.01(C)(1). But ASL's payment of the commercial-activity tax does not give ASL or Agnew standing as a contributor to a special fund for schools.

**{¶ 36}** Absent statutory authority, a taxpayer lacks standing "to institute an action to enjoin the expenditure of public funds unless he has some special interest therein by reason of which his own property rights are placed in jeopardy." *Masterson*, 162 Ohio St. 366, 123 N.E.2d 1, at paragraph one of the syllabus. Taxpayers who contribute "to a special fund have a special interest in that fund for

16

purposes of standing." *Racing Guild of Ohio,* 28 Ohio St.3d 317, 503 N.E.2d 1025 at paragraph two of the syllabus.

{¶ 37} In support of their argument regarding standing as contributors to special funds for schools, appellants rely on two of this court's decisions: *Racing Guild of Ohio* and *State ex rel. Dann v. Taft*, 110 Ohio St.3d 252, 2006-Ohio-3677, 853 N.E.2d 263. But neither *Racing Guild of Ohio* nor *Dann* supports appellants' argument that they have standing because certain appellants contribute to the commercial-activity tax and some commercial-activity-tax funds are used to fund public schools.

{¶ 38} In *Dann*, the relator sought a writ of mandamus ordering the governor to turn over reports relating to the Ohio Bureau of Workers' Compensation. The relator argued that he needed the reports because he was considering filing a lawsuit alleging wrongdoing with regard to the Ohio Workers' Compensation Fund, but the governor argued that executive privilege protected the reports. The relator responded that he had a particularized need for the reports because, as an employer, he contributed to the Workers' Compensation Fund. In analyzing the relator's need under Ohio's privilege laws, we noted that although the relator would not have standing to file a suit as a taxpayer who paid taxes into the general fund, he arguably had "special fund" taxpayer standing to file such a suit because he contributed to the Workers' Compensation Fund as an employer. *Id*. at ¶ 9-10. But whether the relator did, in fact, have "special fund" standing was not before us.

{¶ 39} The relevant plaintiffs in *Racing Guild of Ohio* were pari-mutuel clerks who paid license fees into the Ohio State Racing Commission's operating fund, which the commission used to defray its operating costs, salaries, expenses, and the cost of administering and enforcing R.C. Chapter 3769. R.C. 3769.03. The clerks alleged that the commission did not receive license fees from all persons participating in the racing industry because it failed to require licensure of certain

individuals that participated in racing. In assessing the plaintiffs' standing, this court's focus remained on personal harm to the plaintiffs. We stated as follows:

> The only reasonable result of [the commission's not requiring license fees from everyone participating in racing] is an inevitable increase in the amount of the fees paid by each individual [who is required to pay] or a decrease in services rendered or the effectiveness of the commission's actions. The claimed illegal failure of the commission to require licensing and the payment of license fees of participants in the racing industry into the special fund logically could result in either the need for a fee increase sooner than would be required or necessitate a fee increase of a greater amount or both.

*Racing Guild of Ohio* at 322. We held that the clerks had a special interest in the special fund and thus had standing to challenge the commission's actions because those actions jeopardized the clerk's "property rights to whatever portion of their income that might go to these increased license fees." *Id.*

{¶ 40} Unlike the license fees in *Racing Guild of Ohio*, ASL's payment of the commercial-activity tax does not give ASL a special interest in how the commercial-activity tax is collected. R.C. 5751.02(A) created the commercial-activity tax—a tax "for the privilege of doing business in this state"—for the general "purpose of funding the needs of this state and its local governments." The commercial-activity tax is paid into the commercial-activities-tax-receipts fund, which is, in turn, credited to the revenue-enhancement fund, the commercial-activity-tax-motor-fuel-receipts fund, the general revenue fund, the school-district tangible-property-tax replacement fund, and the local-government tangible-

property-tax replacement fund in statutorily prescribed percentages. R.C. 5751.02(C)(1).

{¶ 41} R.C. 5709.92 and 5709.93 govern payments from the school-district tangible-property-tax replacement fund and the local-government tangible-property-tax replacement fund respectively. If the total amount in either fund is insufficient to make the payments required by R.C. 5709.92 or 5709.93, the shortfall is remedied from the general revenue fund, and not from an increase in the commercial-activity tax. R.C. 5751.02(D)(1) and (2). Thus, the allegedly unconstitutional exemption of the casinos from paying the commercial-activity tax, and the resultant reduction in revenue derived from it, has no bearing on the amount of commercial-activity tax that any other taxpayer, including ASL, owes. Nor does the amount of commercial-activity tax collected affect payments from the school-district tangible-property-tax replacement fund and the local-government tangible-property-tax replacement fund.

{¶ 42} Although ASL has an interest in the commercial-activity tax as a payer of that tax, appellees' alleged wrongdoing does not jeopardize ASL's own property rights. Any harm from a shortfall would be felt by the public in general and not solely by contributors to the commercial-activity tax. In contrast to the clerks in *Racing Guild of Ohio*, appellants have simply not alleged, and there is no set of facts consistent with the amended complaint that would demonstrate, injury to ASL different from the general public based on the manner in which the commercial-activity tax is or is not applied to the casinos. To hold that special-fund standing exists in this case would expand special-fund standing in a manner that comes perilously close to recognizing general-taxpayer standing. We accordingly reject the argument that appellants have standing because certain appellants contribute to the commercial-activity tax.

{¶ 43} For these reasons, we decline to adopt appellants' third proposition of law.

*D. Kinsey's standing and the alleged necessity of allowing opportunity to amend a complaint before its dismissal for failure to show standing*

{¶ 44} Like appellant's third proposition of law, their final proposition of law can be broken into two components. First, they claim that the lower courts improperly applied the legal standard for determining whether to dismiss Kinsey's equal-protection claim for lack of standing, based on the absence of an allegation that Kinsey was "ready and able" to engage in the business of casino gaming in Ohio. Second, they argue that a court must allow a plaintiff an opportunity to amend the complaint before the court may dismiss the complaint for failure to state a claim for lack of standing.

*1. Kinsey's standing*

{¶ 45} In their amended complaint, appellants alleged that Kinsey "would engage in casino gaming in Ohio but for" Article XV, Section 6(C) of the Ohio Constitution, which "grant[s] a special and exclusive privilege to engage in casino gaming in Ohio to two gaming corporations." Kinsey's claim requests a declaration that Article XV, Section 6(C) of the Ohio Constitution, H.B. 1, H.B. 519, and H.B. 277 grant a monopoly on casino gambling to certain gaming companies and that this monopoly violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Appellants argue that Kinsey's allegation that he would engage in casino gaming but for Article XV, Section 6(C)'s limitation is sufficient to survive appellees' motion to dismiss for lack of standing.

{¶ 46} "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Northeastern Florida Chapter of Associated Gen. Contrs. of Am. v. Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). "The 'injury in fact' in an equal protection case of this variety is the denial of equal

20

treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* For example, to establish standing to challenge a set-aside program based on the inability to compete on an equal footing in the bidding process, a party need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis. *Id.* The Sixth Circuit has applied those principles in a case alleging an equal-protection violation regarding the ability to apply for a casino license, stating that " 'the standing issue hinges on whether [the plaintiff] has sufficiently alleged that it is able and ready to bid for a casino license.' " *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 404 (6th Cir.1999), quoting the district court opinion.

{¶ 47} Appellees correctly point out that Kinsey's general allegation that he "would engage in casino gaming" but for Article XV, Section 6(C) of the Ohio Constitution is weaker than the allegations regarding standing in *Lac Vieux*. There, Lac Vieux alleged that it owned and operated another casino in Michigan, had arranged for development of a casino in Detroit, had selected a site for the casino, and was ready and able to submit the requisite information for a casino-development proposal, along with the required fees. *See Lac Vieux* at 404-405. But *Lac Vieux*, as well as *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir.2003), which appellees also cite, was decided on summary judgment, not a motion to dismiss. The level of specificity in Lac Vieux's complaint is not required to survive a Civ.R. 12(B)(6) motion to dismiss, because at the pleading stage, we presume that general allegations embrace the specific facts necessary to support a claim. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, 119 L.Ed.2d 351. Kinsey's allegation that he would engage in casino gaming but for the bar in Article XV, Section 6(C) of the Ohio Constitution, is a sufficient allegation of injury to withstand a Civ.R. 12(B)(6) motion to dismiss.

**{¶ 48}** As noted above, under traditional standing principles, a plaintiff must show, at a minimum, not only that he or she has suffered an injury that is fairly traceable to the defendant's allegedly unlawful conduct, but also that the requested relief is likely to redress the injury. *ProgressOhio.org, Inc.,* 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, at ¶ 7, quoting *Moore*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, at ¶ 22. Appellees argue that Kinsey lacks standing because the relief he requests would not redress his injury.

**{¶ 49}** Kinsey requests relief in the form of a declaration that Article XV, Section 6(C) of the Ohio Constitution, H.B. 1, H.B. 519, and H.B. 277 violate the Fourteenth Amendment to the United States Constitution. A declaration that those provisions are unconstitutional would rescind the limited grant of authority for casino gaming rather than allow all potential operators, like Kinsey, to conduct casino gambling in the state. But the injury here is the denial of equal treatment resulting from the limitations imposed by Article XV, Section 6(C) of the Ohio Constitution, H.B. 1, H.B. 519, and H.B. 277. *See Northeastern Florida Chapter of Associated Gen. Contrs. of Am.*, 508 U.S. at 666, 113 S.Ct. 2297, 124 L.Ed.2d 586. While a declaration that those provisions violate the Fourteenth Amendment to the United States Constitution would not grant the general public permission to conduct casino gambling in Ohio, it would eliminate the current inequality in the opportunity to obtain that benefit. Accordingly, we conclude that Kinsey's allegation is sufficient to meet the redressability element of standing.

**{¶ 50}** Whether Kinsey could conclusively demonstrate standing were he faced with a motion for summary judgment is not before us. But under the standards prescribed for dismissal under Civ.R. 12(B)(6), Kinsey has sufficiently alleged standing to withstand appellees' motion to dismiss.

*2. Necessity of allowing an opportunity to amend a complaint before dismissal*

**{¶ 51}** Appellants' final argument is that a court must allow a plaintiff an opportunity to amend a complaint before the court dismisses that complaint for

failure to show standing. But the facts of this case foreclose that argument. First, the plaintiffs in this case were, in fact, allowed an opportunity to amend their complaint, and they took full advantage of this opportunity by doing so. Moreover, they filed their amended complaint *after* the state filed motions to dismiss alleging that appellants lacked standing. Second, there is no evidence in the record that appellants requested leave from the trial court to file a second amended complaint or that they submitted a second amended complaint. By their own actions, appellants effectively waived this issue, and we decline to set forth a statement of law requiring courts to allow a plaintiff an opportunity to amend a complaint before the court dismisses a case based on a lack of standing. We accordingly decline to adopt appellants' fourth proposition of law.

### III. Conclusion

{¶ 52} Appellants have failed to establish that they have standing based on their status as individuals experiencing the negative effects of gambling, parents and a teacher of public-school students, and contributors to the commercial-activity tax. Because no individual member of Ohio Roundtable has established standing, we further conclude that the Ohio Roundtable lacks organizational standing. Kinsey, however, has sufficiently alleged standing to survive appellees' motion to dismiss his equal-protection claim. Finally, because appellants did not attempt to file a second amended complaint, we decline to issue a statement of law requiring courts to provide a plaintiff an opportunity to amend a complaint before a case is dismissed for lack of standing. For these reasons, we affirm in part and reverse in part the judgment of the Tenth District Court of Appeals. We specifically reverse the Tenth District's judgment only to the extent that it affirms the trial court's dismissal of Kinsey's equal-protection claim, and we remand to the Franklin County Court of Common Pleas for further proceedings on that claim. In all other respects, we affirm the Tenth District's judgment.

Judgment affirmed in part

and reversed in part,

and cause remanded.

KENNEDY, J., concurs.

PFEIFER, J., concurs in part and dissents in part and concurs in judgment with an opinion in which O'NEILL, J., joins.

LANZINGER, J., concurs in part and dissents in part with an opinion in which O'CONNOR, C.J., and DEGENARO, J., join.

MARY DEGENARO, J., of the Seventh Appellate District, sitting for O'DONNELL, J.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 53} As far as I can tell, public-right standing continues to exist in Ohio. *See State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 471, 715 N.E.2d 1062 (1999) ("This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties"). But this court continues to treat this form of standing, and the litigants who rely on it, dismissively. *See ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 37-55 (Pfeifer, J., dissenting) (explaining the reasons for public-right standing generally and why I believe it applied in that case).

{¶ 54} This case is of great interest to the public. It involves a 2009 constitutional amendment on which over 3,000,000 Ohioans cast a vote. Ohio Secretary of State, *State Issue 3: November 3, 2009, Official Results*, http://www.sos.state.oh.us/sos/elections/Research/electResultsMain/2009Election Results/20091103issue3.aspx (accessed Jan. 14, 2016). We should honor the people of Ohio enough to allow a judge to hear the litigants' arguments on the merits in this case. Whether the arguments are good enough to carry the day is

unknown, but the litigants deserve the right to be heard concerning a significant constitutional amendment that as recently as six years ago engaged the attention of over 3,000,000 Ohioans.

{¶ 55} I don't think that Ohioans should have the unfettered ability to challenge provisions of the Constitution of Ohio, though any concerns that there will be an avalanche of cases asserting public-right standing are unwarranted because this court has demonstrated its ability to reject frivolous, inconsequential, or inane claims. But when citizens bring before the court significant and important issues that affect millions of Ohioans, this court should not throw up its hands and sputter "but these people have not suffered a differentiated harm."

{¶ 56} I concur in the portion of the majority opinion that concludes that appellant Frederick Kinsey has standing. I dissent from the portions of the majority opinion that conclude that the various other appellants do not have standing, because I believe that they have public-right standing. I would allow all of the issues raised to be heard on the merits. Accordingly, I concur in part and dissent in part.

O'NEILL, J., concurs in the foregoing opinion.

_____

**LANZINGER, J., concurring in part and dissenting in part.**

{¶ 57} Although I agree with the majority's determination that appellants Robert L. Walgate Jr., Sandra Walgate, Joe Abraham, David Zanotti, and the American Policy Roundtable have failed to establish standing and with the decision to decline to require courts to provide a plaintiff an opportunity to amend a complaint before a case is dismissed for lack of standing, I do not agree that appellant Frederick Kinsey has sufficiently alleged standing to survive appellees' motion to dismiss. I therefore dissent in part and would affirm the Tenth District Court of Appeals' judgment dismissing this case in its entirety.

*I. Analysis*

*A. Kinsey lacks standing to bring this claim*

**{¶ 58}** Although Kinsey claims that he was denied equal protection, his claim is simply one item in a laundry list of challenges compiled by appellants in a transparent attempt to have Article XV, Section 6(C) of the Ohio Constitution and the implementing statutes of the casino amendment invalidated simply because they do not want casino gambling in Ohio.[2] Certain appellants allege that the negative effects of gambling constitute injury in fact. But Kinsey alleges only that he "would engage in casino gaming in Ohio but for the provisions of" the amendment to Ohio's Constitution that "grant[s] a special and exclusive privilege to engage in casino gaming in Ohio to two gaming corporations." The complaint sets forth one claim titled "Grant of Monopoly," which restates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and declares that Ohio's casino-gaming amendment and statutes grant a monopoly that violates the Fourteenth Amendment. But there is no allegation directly connecting Kinsey to this claim. In the prayer for relief, Kinsey requests a declaration that Ohio's casino-gaming amendment and statutes violate the Fourteenth Amendment of the United States Constitution. From the sum total of these allegations, the majority holds that Kinsey has standing. The absurdity of this position is obvious.

**{¶ 59}** The constitutional amendment that authorizes casino gambling was a policy choice instituted by initiative and voted on by the public. The direct consequence of the relief Kinsey seeks—declaring the Ohio Constitutional provision on casino gaming unconstitutional under the Fourteenth Amendment to the United States Constitution—would do through the court what opponents to gambling were unable to do at the ballot box.

---

[2] It defies logic for an individual who says he wants to be a casino operator to hitch his wagon to an amended complaint in which all the other plaintiffs seek to curtail or overturn the amendment and statutes.

**{¶ 60}** Of course the voters themselves retain the power to decide to prohibit casino gambling by repealing the constitutional amendment. Article II, Section 1 of the Ohio Constitution provides:

> The legislative power of the state shall be vested in a General Assembly consisting of a senate and house of representatives but the people reserve to themselves the power to propose to the General Assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided. They also reserve the power to adopt or reject any law, section of any law or any item in any law appropriating money passed by the General Assembly, except as hereinafter provided; and independent of the General Assembly to propose amendments to the constitution and to adopt or reject the same at the polls. The limitations expressed in the constitution, on the power of the General Assembly to enact laws, shall be deemed limitations on the power of the people to enact laws.

The constitution thus provides for a procedure by which the people may amend the constitution or enact laws. In allowing Kinsey's lawsuit to continue, the majority allows one individual who has insufficiently alleged harm or redressability, i.e., who lacks standing, to override the will of the people of Ohio.

**{¶ 61}** Indeed, standing "embodies general concerns about how courts should function in a democratic system of government." *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 469, 715 N.E.2d 1062 (1999). Four justices now allow the will of the people to be questioned based on the mere assertion by one individual that he "would engage" in casino gambling, without requiring assertion of further facts showing that he indeed is ready and able

to do so. This attempt to usurp the will of the people is an end-run around the legislative process and, although disguised as a procedural question of law, should not be countenanced.

{¶ 62} Under our traditional standing principles, a plaintiff must show, at a minimum, that he or she has suffered " '(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief.' " *See ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, at ¶ 7, quoting *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, at ¶ 22. Kinsey has not met these criteria. He has not sufficiently shown that he has suffered an injury, and he has not shown that the relief he requests would redress his alleged injury.

*B. The complaint does not sufficiently allege an injury*

{¶ 63} According to the majority, "Kinsey's allegation that he would engage in casino gaming but for the bar in Article XV, Section 6(C) of the Ohio Constitution, is a sufficient allegation of injury to withstand a Civ.R. 12(B)(6) motion to dismiss." Majority at ¶ 47.

{¶ 64} The majority relies upon federal cases to bolster its conclusion that Kinsey has standing, including *Northeastern Florida Chapter of Associated Gen. Contrs. of Am. v. Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), and *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397 (6th Cir.1999). Both cases are distinguishable, as discussed below. The majority also relies on *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), a case that specifically considered whether a plaintiff had properly invoked federal jurisdiction, in stating that "at the pleading stage, we presume that general allegations embrace the specific facts necessary to support a claim." Majority opinion at ¶ 47.

{¶ 65} But in presuming the existence of additional facts, the majority presupposes the existence of an injury that is not alleged, even generally.

28

According to the majority, "the injury here is the denial of equal treatment resulting from the limitations imposed by Article XV, Section 6(C) of the Ohio Constitution, H.B. 1, H.B. 519, and H.B. 277." Majority opinion at ¶ 49. This language is nowhere in the complaint. Instead, the majority pulls this "denial of equal treatment" language from the United States Supreme Court's decision in *Northeastern*. *Id*. at 666. The majority acknowledges that in *Lac Vieux,* a case that was before the Sixth Circuit for review of a summary judgment, the Sixth Circuit explained that the district court had correctly noted that " 'the standing issue hinges on whether [the plaintiff] has sufficiently *alleged* that it is able and ready to bid for a casino license.' " (Emphasis added.) *Id.* at 404. Notably, the court used the word "alleged," not "proved," although it was reviewing a summary judgment.

{¶ 66} The amended complaint in this case alleges simply that Kinsey "is being deprived of the right to exercise the trade or business of casino gaming in Ohio" by Article XV, Section 6(C) of the Ohio Constitution and that he "would engage in casino gaming in Ohio but for" Article XV, Section 6(C) of the Ohio Constitution, H.B. 1, H.B. 519, and H.B. 277, which "grant a special and exclusive privilege to engage in casino gaming in Ohio to two gaming corporations." There is absolutely no allegation of an injury that the requested remedy can redress.

{¶ 67} The complaint here avers nothing about actions that Kinsey took, expenditures that he made, or any other facts showing how he was injured by the amendment or that he was ready and able to participate in casino gaming. " '[I]n ruling on standing, it is both appropriate and necessary to look to the substantive issues * * * to determine whether there is *logical nexus between the status asserted and the claim* sought to be adjudicated * * * to assure that [the litigant] is a proper and appropriate party to invoke' legal proceedings." (Emphasis added.) *Clifton v. Blanchester*, 131 Ohio St.3d 287, 2012-Ohio-780, 964 N.E.2d 414, ¶ 18, quoting *Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Here, there are no allegations to support a logical nexus between Kinsey's status as

someone who would like to operate a casino and his claim that the casino-gaming amendment and statutes should be struck down for granting a monopoly that violates equal protection. Additionally, "standing depends on whether the plaintiffs have alleged such a personal stake in the outcome of the controversy that they are entitled to have a court hear their case." *ProgressOhio.org, Inc.*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 7. But the complaint is devoid of allegations that Kinsey has a personal stake in the outcome of the controversy different from any other member of the public.

{¶ 68} The majority's holding that Kinsey has standing is based on unsupported, incomplete, and conclusory allegations and allows his challenge to a constitutional amendment to go forward on the slender reed of what he says he "would" do. There is no factual allegation that he has done anything or is capable of doing anything to further this hope. The lack of a logical nexus between the status he asserts and the claim he seeks to be adjudicated is especially clear when the significant financial, experiential, and other resources required to establish and operate a casino are considered. Under the majority's logic, every person in the world has standing to state a claim identical to Kinsey's, as long as the complaint contains the simple statement that he or she would engage in casino gaming in Ohio but for the current state of the law. Such an expansive interpretation of pleading effectively eliminates the need for and purpose of Ohio's standing doctrine.

{¶ 69} I would instead hold that Kinsey's mere statement of aspiration is insufficient to allege actual harm or the possibility that the harm could be redressed. The factual allegations of the complaint must be accepted as true when a court reviews a dismissal on a Civ.R. 12(B)(6) motion. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). But in the first instance, there must be factual allegations from which the court can make all reasonable inferences. If it is beyond doubt that Kinsey can prove no set of facts entitling him to relief, his

claim must be dismissed. *See O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus.

{¶ 70} The majority notes that the plaintiff in *Lac Vieux* "alleged that it owned and operated another casino in Michigan, had arranged for development of a casino in Detroit, had selected a site for the casino, and was ready and able to submit the requisite information for a casino-development proposal, along with the required fees." Majority opinion at ¶ 47, citing *Lac Vieux* at 404-405. While it is true that *Lac Vieux* involved a case at the summary-judgment stage, that case does not stand for the proposition that a mere conclusory statement is sufficient to survive a motion to dismiss. The *Lac Vieux* case was able to proceed to the summary-judgment stage precisely *because* the plaintiff set forth factual allegations from which it could be afforded all reasonable inferences. Unlike the plaintiffs in *Lac Vieux*, Kinsey failed to set forth any further allegations. His statement is accordingly an insufficient allegation of injury to withstand a Civ.R. 12(B)(6) motion to dismiss.

*C. Any alleged injury would not be redressed by the requested relief*

{¶ 71} Moreover, even if we were to assume that sufficient facts have been pled asserting an injury to Kinsey, he has not alleged that his injury is likely to be redressed by the requested relief. Kinsey alleges that he is unable to operate a casino facility in Ohio because the Ohio Constitution grants a monopoly[3] to certain gaming companies. He requests a declaration that Article XV, Section 6(C) violates equal protection, but such a declaration would rescind the limited grant of authority that the provision grants rather than allow all potential operators to conduct casino gambling in the state. It follows then that Kinsey's requested relief would not redress his injury, i.e., his inability to operate a casino under current Ohio

---

[3] In 2015, the voters passed an antimonopoly amendment, see Article II, Section 1e of the Ohio Constitution; however, that amendment has no effect on the case before us.

law. Instead, the requested relief would simply eliminate the ability of anyone to operate a casino. The majority concludes that no redressability problem exists, stating, "While a declaration that those provisions violate the Fourteenth Amendment to the United States Constitution would not grant the general public permission to conduct casino gambling in Ohio, it would eliminate the current inequality in the opportunity to obtain that benefit. Accordingly, we conclude that Kinsey's allegation is sufficient to meet the redressability element of standing." Majority at ¶ 49.

{¶ 72} This concoction is akin to throwing the baby out with the bathwater and ignores Kinsey's sole allegation that he "is being deprived of the right to exercise" a casino-gaming business and "would engage in casino gaming" if he could. Extrapolating a disingenuous pleading into an injury and remedy to grant standing on the basis of a constitutional inequality is pretzel logic, twisting the straight line of standing analysis into something unrecognizable.

{¶ 73} In *Northeastern,* a case on which the majority relies, the United States Supreme Court addressed standing in an equal-protection case challenging a city ordinance requiring that funds be set aside to award city contracts to minority-owned businesses. 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586. There, the court concluded that "[t]o establish standing, * * * a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Northeastern* at 666. Notwithstanding the use of the phrase "to establish standing," the court concluded that the petitioner "sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury." *Id.*, fn. 5. In contrast to Kinsey's requested relief in this case, the requested termination of the set-aside program in *Northeastern* would have opened the city-contract-bidding process to all contractors, including the petitioner, which alleged that its members "regularly

32

bid on and perform construction work for the City of Jacksonville." *Id.* at 659. Here, however, Kinsey's requested relief would deprive everyone of the ability to operate a casino, even Kinsey, and there is no additional allegation to support the weak aspirational thought that he would engage in casino gaming if it were open to him.

{¶ 74} The theory of redressability devised by the majority does not solve any problem identified in Kinsey's amended complaint. Had Kinsey pled that because the opportunity to operate a casino is not open to all, it should not be open to any, the majority's conclusion might be appropriate. However that is not his position. Nor would that assertion square with his allegation of injury. By joining with the other appellants in the underlying complaint, it is apparent that his goal is to do away with all casino gaming in Ohio, in spite of the will of the people. The majority accommodates this effort by giving Kinsey the legitimacy of standing to proceed. I cannot agree with this conclusion.

## *II. Conclusion*

{¶ 75} Because our state precedent requires a showing of actual injury and redressability, I would hold that Kinsey's bare, unsupported allegation that he "would engage in casino gaming in Ohio" if he were permitted to do so is insufficient to establish standing in this case, and therefore, I respectfully dissent from the majority's judgment with regard to him, and I would affirm the judgment of the Tenth District Court of Appeals in its entirety.

O'CONNOR, C.J., and DEGENARO, J., concur in the foregoing opinion.

_____

Black, McCuskey, Souers & Arbaugh, Thomas W. Connors, and James M. Wherley, for appellants.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Michael J. Hendershot, Chief Deputy Solicitor, and Stephen P. Carney, Deputy

Solicitor, for appellees Governor John R. Kasich, Ohio Casino Control Commission, Ohio Lottery Commission, and Tax Commissioner Joseph W. Testa.

Calfee, Halter & Griswold, L.L.P., Christopher S. Williams, James F. Lang, Matthew M. Mendoza, Alexander B. Reich, and Lindsey E. Sacher, for appellees Rock Ohio Caesars, L.L.C., Rock Ohio Caesars Cleveland, L.L.C., and Rock Ohio Caesars Cincinnati, L.L.C.

Ice Miller, L.L.P., Matthew L. Fornshell, John H. Oberle, and Albert G. Lin, for appellees Central Ohio Gaming Ventures, L.L.C., and Toledo Gaming Ventures, L.L.C.

Dinsmore & Shohl, L.L.P., and Alan H. Abes, for appellee Thistledown Racetrack, L.L.C.

Taft Stettinius & Hollister, L.L.P., Charles R. Saxbe, James D. Abrams, Irv Berliner, and Celia M. Kilgard, for appellees Northfield Park Associates, L.L.C., Lebanon Trotting Club, Inc., MTR Gaming Group, Inc., and PNK (Ohio), L.L.C.

Porter Wright Morris & Arthur, L.L.P., Tami Hart Kirby, William G. Deas, and L. Bradfield Hughes, urging affirmance for amici curiae the Dayton Chamber of Commerce, the Youngstown/Warren Regional Chamber, the Seafarers Entertainment and Allied Trades Union, the Affiliated Construction Trades Ohio Foundation, and the Lebanon City School District.

Paul Langon Cox III, Chief Counsel, Fraternal Order of Police of Ohio, Inc., urging affirmance for amicus curiae the Fraternal Order of Police of Ohio, Inc.

_____